## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CoStar Group, Inc.,<br>1331 L Street N.W.<br>Washington, DC 20005, and<br><br>CoStar Realty Information, Inc.,<br>1331 L Street N.W.<br>Washington, DC 20005,<br><br>        Plaintiffs,<br><br>       v.<br><br>Richard Martin,<br>2404 Glen Forest Lane<br>Plano, TX 75023,<br><br>        Defendant. | Civil Action No. _____<br><br>**JURY TRIAL<br>DEMANDED** |

## COMPLAINT

1.     Plaintiffs CoStar Group, Inc., a public company, and CoStar Realty Information, Inc., its wholly owned subsidiary, together constitute the nation's leading provider of commercial real estate information, and operate the most comprehensive commercial real estate information database available in the world.  Plaintiffs together are referred to as "CoStar."

2.     CoStar brings this case against Defendant Richard Martin ("Martin") to redress unauthorized access to, and use of, CoStar's subscription database, and to protect CoStar's intellectual property.  Using another individual's CoStar password, Martin logged into the subscription database repeatedly over several months, and—using software he had created—downloaded masses of CoStar data to create a knock-off database.

3.     At all relevant times Martin was an agent of Pathway Mentor, LLC ("PM LLC"), a company based in northern Texas that operates in the commercial real estate marketplace.  PM LLC is a former CoStar customer.  Beginning in October 2016, PM LLC executed a series of

license agreements with CoStar, the terms of which permitted two individuals—Rozann Marquis and Robert Martin—to access CoStar's subscription database.  At no time was Richard Martin authorized to use PM LLC's account, or any other CoStar customer's account.

4.      Rather than pay to subscribe for CoStar's services, Richard Martin decided to steal them.  He obtained a username and password from Marquis and used those credentials to gain access to CoStar's database.  Martin, in fact, went beyond simply stealing CoStar's service: his unauthorized access was for the purpose of creating a huge, unlicensed derivative database populated by CoStar data for unrestricted use by PM LLC.

5.      From around July 2017 through September 2017, Martin used Marquis' username and password to access CoStar's database at an astonishing rate.  After Martin commandeered Marquis' credentials, the traffic on the account increased significantly.  On nineteen different occasions, Martin generated the single largest number of CoStar database hits in the United States—surpassing each of the over one-hundred-thousand other subscribers to the product.

6.      Martin was generating this huge volume of traffic because he was extracting massive amounts of CoStar's data.  Using this data, Martin created an unauthorized derivative database and made it available to his colleagues at PM LLC.  According to statements made to CoStar by PM LLC co-founders Marquis and Robert Martin, PM LLC then used this pirated database for its own business purposes.

7.      PM LLC not only was aware of Martin's unlawful conduct, but helped facilitate his unauthorized access to CoStar's intellectual property.  PM LLC has admitted to CoStar that it provided Martin with the username and passcode issued to Marquis, in direct violation of its license agreements.  According to Marquis, PM LLC took such actions knowing that Martin intended to use those credentials to access CoStar's product and extract CoStar's proprietary real

estate data.

8.      CoStar wrote to Martin regarding his unauthorized access to, and use of, CoStar's subscription database, and urged him to redress his misconduct.  Martin never responded.

9.      As a consequence of Martin's unlawful actions, CoStar is entitled to damages and/or disgorgement of Martin's profits derived from his misconduct, as well as injunctive relief to prevent continued irreparable harm to its business.

*  *  *  *  *

10.      CoStar employs more than three thousand people in the United States and, as a result of their diligent efforts—and the investment of nearly five billion dollars over the last thirty-plus years—CoStar has developed the most comprehensive commercial real estate information database available in the world.

11.      CoStar's subscription database contains professionally researched information about commercial properties across the country.  The database has well over a hundred thousand subscribers, including all of the leading commercial real estate brokerages in the United States, as well as a significant number of smaller brokerages, property owners, banks, retailers, real estate investment trusts, and other professionals.  The subscription database also counts a number of federal, state, and local government entities and agencies as its users.

12.      CoStar generates and updates the database's content at a cost of over $600 million each year.  Nearly thirteen thousand CoStar researchers have contributed to the subscription database since its creation, adding nearly five million properties, taking over twelve million photographs, and driving and flying over two million miles per year.  Researchers collect this information through various means, including through in-person site inspections and targeted calls to individual commercial real estate owners, developers, and brokers.

13.     While the subscription database provides exceptional benefits to CoStar's paying customers, it also has a positive impact on consumer welfare in the larger commercial real estate ecosystem.  CoStar's subscription database provides greater transparency in the form of readily available, professionally researched, and regularly updated commercial real estate information. The existence of this information has made traditional commercial real estate transactions more efficient, and has also facilitated a more diverse range of commercial real estate deals.  The net result is greater liquidity and significantly mitigated risk in one of the world's most valuable and important asset classes:  commercial real estate.

14.     The important role that CoStar plays in the commercial real estate market is demonstrated by the extent to which its users interact with the service.  Each day, users conduct nearly nine million searches for commercial real estate on CoStar products, including the subscription database.  CoStar estimates that its products play a part in supporting one trillion dollars of commercial real estate leases, sales, and mortgage originations in the United States each year.

15.     CoStar licenses its subscription database content for a monthly fee.  Those fees, which vary according to the scope of access a user seeks, generate significant revenue for CoStar and enable it to employ thousands of people for, and invest billions of dollars in, research and product enhancements.  The stealing of access to CoStar presents a major threat to the ongoing viability of CoStar's products.

16.     Because CoStar's database is central to its business, CoStar protects it through both contractually binding agreements and technological means.  For example, CoStar contractually prohibits users from sharing passwords and from mass-downloading data into derivative databases, and employs password authentication modes that vary according to risk,

firewalls, and anti-hacking software to limit access to and manipulation of its data.

## THE PARTIES

17.     CoStar Group is a corporation organized and existing under Delaware law with its principal place of business and corporate office located at 1331 L Street, N.W., Washington, District of Columbia 20005.

18.     CoStar Realty is a corporation organized and existing under Delaware law with its principal place of business and corporate office located at 1331 L Street, N.W., Washington, District of Columbia 20005.  It is a wholly owned subsidiary of CoStar Group.

19.     Martin is an individual domiciled in Texas, and, on information and belief, he resides at 2404 Glen Forest Lane, Plano, Texas 75023.

## JURISDICTION AND VENUE

20.     This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 because this action alleges violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because these claims arise from a common nucleus of operative facts.

21.     The Court has personal jurisdiction over Martin because he caused tortious injury in the District of Columbia by an act or omission outside the District of Columbia, and regularly engaged in a persistent course of conduct in the District of Columbia when he improperly accessed and exported information from CoStar's subscription database.  Martin also is subject to personal jurisdiction in this district because he consented to the Court's jurisdiction in a binding contract.

22.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district, and a

substantial part of the intellectual property that is the subject of this action is situated in this judicial district. Venue also is proper in this judicial district under a binding forum selection clause, pursuant to which Martin waived any objections to venue in this judicial district.

## FACTUAL ALLEGATIONS

I.     **Martin Knowingly and Intentionally Gained Unauthorized Access to CoStar's Subscription Database for the Purpose of Extracting CoStar's Proprietary Information.**

23.     On or about October 31, 2016, Marquis executed a "CoStar License Agreement and Subscription Form" on behalf of PM LLC. In that agreement, CoStar authorized Marquis to access and use CoStar's subscription database on behalf of PM LLC.

24.     PM LLC and CoStar later executed three "Subscription Change Forms," the terms of which permitted both Marquis and *Robert* Martin to access and use CoStar's database. At no time did CoStar authorize *Richard* Martin to access or use its database on his own behalf, on behalf of PM LLC, or on behalf of any other CoStar customer.

25.     In or around January 2017, Marquis' account began exhibiting suspicious behavior, which accelerated in intensity in July 2017.

26.     Between July 2017 and September 2017, Marquis' account generated an unprecedented number of hits on a near-daily basis. A "hit" refers to a request to CoStar's web server for information—such as a photograph or graphic image. In May 2017, Marquis' account generated an average of approximately 377 hits per day over the nine days it was in use. But between July and September 2017, the rate and frequency of this activity increased dramatically. During this timeframe, Marquis' account routinely produced over 20,000 hits per day. On one occasion the account generated over 30,000 hits in less than 24 hours, more than 85 times the prior average, putting a significantly increased load on CoStar's servers and diverting CoStar resources from monitoring legitimate database traffic.

6

27.     This activity not only exceeded Marquis' prior usage trends by thirty-five times, it also exceeded the typical usage trends of almost all other CoStar subscribers during the same period.  Out of CoStar's entire subscriber base of over one-hundred-thousand users, Marquis' account generated the largest number of hits on nineteen different dates within a three-month period; it ranked within the top five over seventy times.

28.     Given the scale of the access, CoStar looked into these suspicious activities.  It determined that Martin had gained unauthorized access to CoStar's database for the purpose of extracting proprietary information, and that PM LLC had assisted Martin's efforts, in violation of multiple terms of its license agreements.  When CoStar confronted PM LLC about its activities, PM LLC admitted these facts.

29.     Specifically, PM LLC co-founder Marquis told CoStar that Martin created software capable of copying and extracting information from CoStar's database, and importing this information into a local unauthorized database that Martin separately maintained.  PM LLC co-founder *Robert* Martin separately admitted to CoStar that *Richard* Martin's software typically extracted information concerning 5,000 commercial properties at one time.

30.     Marquis further admitted to CoStar that PM LLC assisted Martin by providing him with Marquis' username and password.  When PM LLC shared this information, it knew that Martin was not authorized to access CoStar's database.  According to Marquis, PM LLC also knew that Martin intended to access the database for the purpose of exporting information into a derivative database.

31.      Between July and September 2017, Martin used Marquis' credentials to gain unauthorized access to CoStar's subscription database on a near-daily basis.

32.     Martin obtained this access by falsely representing that he was authorized to use

CoStar's database.  Every individual who seeks to access CoStar's database is directed to "Log In with *your* current CoStar username and password."  (Emphasis added.)  In response to this prompt, Martin repeatedly provided a username and password belonging to Marquis, thereby falsely representing to CoStar that he was authorized to access the database.

33.     Every individual who seeks access to CoStar's database also acknowledges that by clicking "Log In," he or she accepts CoStar's Terms of Use (attached as Exhibit A).  CoStar provides a link to its Terms of Use on the Log In page for ease of reference.

34.     The following disclaimer appears in large and clear text at the top of CoStar's Terms of Use:  "YOUR USE OF THIS WEB SITE CONSTITUTES YOUR AGREEMENT TO BE BOUND BY THESE TERMS AND CONDITIONS OF USE."  (Ex. A.)[1]

35.     Individuals using CoStar's database further "agree to be legally bound by the terms and conditions," which "constitute a legal contract between you and CoStar."  (Ex. A.) Users of the database further acknowledge that they have "the right, power and authority to agree to and be bound by the[] Terms of Use," and that if they "do not agree to the Terms of Use, or if [they] do not have the right, power, and authority to agree to and be bound by the[] Terms of Use, [they] may not use the Site."  (Ex. A.)

36.     Thus, each time Martin logged into CoStar's database using Marquis' credentials, he agreed to be bound by the Terms of Use.

37.     The Terms of Use provide:

Those portions of the Product[2] that may be accessed by the general public and that

---

[1] The 2018 Terms of Use (Exhibit A) are substantively identical to the Terms of Use in effect in 2017.  Any differences between the 2017 and 2018 Terms of Use are immaterial to this Complaint.

[2] CoStar defines "Product" as including its "Site, Content, Database, Information, Software and any portion of the foregoing, including any derivatives, adaptations, successors, updates or

do not require any use of Passcodes (as defined below) or facial recognition authentication are referred to as the 'Non-Passcode Protected Product.' *Those portions of the Product that require use of Passcodes ... are available only to individuals or entities ('CoStar Clients'), or those acting through them, who enter into a License Agreement (as defined below) with CoStar that authorizes access to such CoStar service are referred to as the 'Passcode Protected Product*.'

\* \* \* \* \*

Only Authorized Users (defined below) for a Passcode Protected Product may access such product and they may access it solely using the user name, password (collectively, the 'Passcodes') [registered with CoStar] ….

\* \* \* \* \*

An 'Authorized User' is defined as an individual (a) employed by a CoStar Client or an Exclusive Contractor (as defined below) of a CoStar Client at a site identified in the License Agreement, and (b) who is specified in the License Agreement as a user of a specific Passcode Protected Product and represented by the Client to be an employee or Exclusive Contractor of the Client.

(Ex. A (emphasis added).)

38.     The Terms of Use also prohibit certain types of conduct, including:

Access[ing] any portion of a Passcode Protected Product unless you are an Authorized User for such Passcode Protected Product using the Passcodes assigned to you by CoStar to access the components and services of the Passcode Protected Product that your License Agreement authorizes you to access, subject to the terms contained therein and in these Terms of Use.

(Ex. A.)

39.     The Terms of Use emphasize the proprietary nature of the information contained

in CoStar's database:

The information, data, text, software, photographs, images, graphics, organization, layout, design, and other content contained on or provided through this Site (collectively, the 'Content') are proprietary to CoStar and its licensors, and are protected by copyright and other Canadian and international intellectual property rights, laws and treaties.

---

modifications provided thereto and any information derived from the use of the Database, including as a result of the verification of any portion of the Information." (Ex. A.)

[User] acknowledge[s] that the Software, Database, Content, Information, Passcode Protected Product, Non-Passcode Protected Product, and Product constitute the valuable property and confidential copyrighted information of CoStar and its licensors.

(Ex. A.)

40.     Because CoStar's database contains valuable proprietary content, the Terms of

Use prohibit users from copying or exporting any portion of the information contained therein:

[User] shall not … [s]tore, copy or export any portion of the Product into any database or other software, except as expressly set forth in the Permitted Uses above.

[User] shall not … [m]odify, merge, decompile, disassemble, scrape, translate, decode or reverse engineer any portion of the Product, or use any data mining, gathering or extraction tool, or any robot, spider or other automatic device or manual process, to monitor or copy any portion of the Product or the data generated from it.

(Ex. A.)

41.     The Terms of Use also forbid users from creating, directly or indirectly, any

derivative database or other derivative works of the licensed product.

Notwithstanding anything to the contrary herein, you shall not … [u]se .… any Information from the Product, including Information that has been verified or confirmed by you or anyone else, to directly or indirectly create or contribute to the development of any database or product.

(Ex. A.)

42.     Each time Martin logged into CoStar's database, he was not (and knew that he

was not) an Authorized User; yet he continued to represent otherwise by using Marquis'

credentials.

43.     Once inside CoStar's database, and in further violation of the Terms of Use,

Martin used the software he developed to extract a huge amount of CoStar's content and import

it directly into a derivative database.

44.     The content Martin extracted from CoStar's database included the identity of, and multiple data fields related to, commercial real estate owners of over a hundred thousand properties.

45.     The timing of Martin's unauthorized extractions coincided with the period of significantly heightened activity CoStar observed on Marquis' account.

46.     Martin's misconduct began months before his mass extractions.  He began accessing CoStar's database using Marquis' credentials as early as January 2017, and continued to steal CoStar's services in this manner for eight months.

47.     PM LLC has admitted to CoStar that Martin provided it with a copy of the database he created.  PM LLC further admitted that its employees, including Rebecca Marrs and Marquis, then used the information contained in the derivative database to complete between 80 and 300 daily phone calls to commercial real estate owners over an extended period.  PM LLC thus used the pirated database, built from CoStar's data, for its own business purposes and benefit.

48.     Upon discovering PM LLC's numerous breaches, CoStar suspended PM LLC's access to the subscription database.

49.     CoStar wrote to Martin in order to afford him the opportunity to redress his misconduct.  Martin never responded.

50.     PM LLC co-founder Robert Martin also directed Martin to prepare a written statement describing his misconduct.  Although Robert Martin agreed to share this statement with CoStar, no such statement was ever provided to CoStar.  CoStar intends to obtain such statement in discovery.

**II.     At Great Effort and Expense, CoStar Endeavors to Protect Its Intellectual Property From Unauthorized Users Like Martin.**

51.     Due in part to the type of brazen misconduct at issue here, CoStar has taken extensive measures to protect its intellectual property and prevent unauthorized access to its products.

52.     CoStar carefully structures its license agreements to ensure that only Authorized Users have access to the database and that authorized use is tightly controlled.  Additionally, all licensees have a clear duty to maintain the confidentiality of CoStar's proprietary information.

53.     Access to CoStar's subscription database is also password protected.  CoStar requires each licensed user to maintain his or her own individual password, and prohibits them from sharing these credentials with any other individual.  And it has created its own two-factor authentication system for logging into the CoStar database.

54.     CoStar also employs a number of third-party products to protect against unauthorized access including, but not limited to, firewalls, anti-virus programs, and anti-malware programs.

55.     CoStar is constantly implementing new security procedures to protect its most valuable resources—its professionally-researched commercial real estate information—at a significant cost.  Efforts (like Martin's) to circumvent these technological safeguards significantly increase these costs.

56.     In addition to its state-of-the-art anti-piracy technology, CoStar operates its own anti-piracy program, which includes monitoring suspicious activity and unauthorized uses of its subscription database.  That program—which caught the misconduct at issue—is costly to administer.

57.     The benefits that CoStar's products provide to its customers and the market at

large are a direct result of the company's efforts—undertaken over decades at a cost of billions of dollars—to research, collect, curate, and create data.  The protection of proprietary data—and CoStar's ability to vindicate its rights in that intellectual property—is therefore critically important.

### FIRST CLAIM FOR RELIEF
### Computer Fraud and Abuse Act, 18 U.S.C. § 1030

58.     CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

59.     CoStar's computers and servers, located in the United States, are involved in interstate and foreign commerce and communication.

60.     CoStar licenses its subscription database content for a monthly fee.  CoStar controls access to its database by requiring its customers to obtain licenses for each individual employee who intends to access the database.  CoStar prohibits individual Authorized Users from sharing their unique credentials with any other person.

61.     In addition, every user of the subscription database or any other CoStar product is subject to CoStar's binding Terms of Use.

62.     Martin knowingly, and with intent to defraud, gained unauthorized access to CoStar's computers and servers for the purpose of extracting CoStar's proprietary data, in violation of CoStar's binding Terms of Use.

63.     Martin knew that CoStar required customers to purchase a subscription in order to access CoStar's proprietary database.  Martin nevertheless gained unauthorized access to CoStar's database using login credentials belonging to Marquis.  Martin knew that he was not authorized to access CoStar's subscription database using these credentials.

64.     Martin's repeated unauthorized access to CoStar's computers and servers allowed

Martin to access, obtain, and use CoStar's contractually protected proprietary information involving interstate communication, in violation of 18 U.S.C. § 1030.

65.     CoStar has suffered over $5,000 worth of damages and losses over a one-year period, in an amount to be proven at trial.  Martin's unauthorized access consumed time and money spent identifying, investigating, and attempting to stop and otherwise respond to Martin's unauthorized access, as described throughout this Complaint.  Further, Martin's unauthorized access has impaired and corrupted CoStar's efforts to measure and analyze legitimate subscriber traffic.  Martin's unlawful conduct undermined the soundness and therefore the value of those data and analyses, which are used for multiple business purposes including search engine optimization and search engine marketing.

66.     CoStar has suffered and will continue to suffer independent, irreparable harm as a result of Martin's continued access to its computers and servers without authorization, which entitles CoStar to injunctive relief.

**SECOND CLAIM FOR RELIEF**
**Fraud**

67.     CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

68.     Martin made multiple false statements of material fact to CoStar by representing that he was Marquis, an Authorized User of PM LLC's account.  Specifically, when directed to "Log In with *your* current CoStar username and password," Martin repeatedly provided CoStar with credentials belonging to Marquis.  In so doing, Martin fraudulently misrepresented his identity.

69.     Martin knew that his representations were false and misleading.

70.     Martin made these false representations with the intent to deceive CoStar and

14

thereby gain unauthorized access to the subscription database.

71.     CoStar reasonably relied upon Martin's misrepresentations when it granted

Martin access to its database.

72.     As a direct and proximate result of Martin's conduct, CoStar has been damaged in

an amount to be proven at trial.

**THIRD CLAIM FOR RELIEF**
**Breach of Contract**
**(In the Alternative to the Second Claim for Relief)**

73.     CoStar repeats and realleges each and every allegation set forth above, and

incorporates them herein by reference.

74.     Each time Martin logged into CoStar's database, Martin agreed to be bound by

CoStar's Terms of Use.

75.     The Terms of Use prohibit anyone who is not an Authorized User from accessing

CoStar's Passcode Protected Product (as those terms are defined in the Terms of Use).

76.     The Terms of Use also prohibit anyone who is not an Authorized User from

storing, copying, or exporting any portion of CoStar's product into any other database or

software.

77.     The Terms of Use forbid anyone who is not an Authorized User from creating

derivative works or databases using any portion of CoStar's product.

78.     Martin breached the Terms of Use by, among other things, accessing CoStar's

Passcode Protected Product; storing, copying, and/or exporting a portion of CoStar's product into

a separate database; and creating and maintaining a derivative database using portions of

CoStar's product.

79.     Martin's breaches of the Terms of Use have been material, willful, repeated, and

15

systematic.

80.     CoStar has performed any conditions, covenants, and promises required of it in accordance with the agreement or, in the alternative, any such conditions, covenants, and promises have been waived.

81.     As a result of Martin's breach of the Terms of Use, Martin has caused damage to CoStar in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(In the Alternative to the Third Claim for Relief)**

82.     CoStar repeats and realleges each and every allegation set forth above, and incorporates them herein by reference.

83.     CoStar's comprehensive commercial real estate information database provides exceptional benefits to CoStar's paying customers.  At all times, CoStar expects that the users of its database are Authorized Users who pay subscription fees in exchange for access.

84.     Each time Martin logged into CoStar's database without authorization, he received a benefit from CoStar for himself and PM LLC.

85.     Martin knew that he stood to benefit from accessing CoStar's database and accepted this benefit by using the database.

86.     It would be unjust for Martin to retain the benefit of accessing CoStar's database without compensating CoStar for that access.

87.     Because Martin has been unjustly enriched at the expense of CoStar, CoStar is entitled to an award reflecting the value of the services Martin obtained and the benefits Martin received from those services.

## PRAYER FOR RELIEF

WHEREFORE, CoStar prays for judgment against Martin as follows:

A.      For an award pursuant to 18 U.S.C. § 1030(g) for compensatory damages;

B.      For an award of damages arising from Martin's breaches of CoStar's Terms of Use, and the misappropriation of CoStar material as a result of those breaches, or, in the alternative, for an award of damages and disgorgement arising from Martin's materially false representations and the unauthorized access to CoStar's proprietary database that resulted from such misrepresentations; and/or for an award reflecting the value of the services Martin obtained and the benefits Martin received from those services;

C.      For a permanent injunction (1) barring Martin's continued unauthorized access to CoStar's computers and servers; (2) barring Martin from sharing or distributing any information acquired from CoStar's database with any other organization or individual; and (3) ordering Martin to purge all CoStar content from any computers, databases, or servers that he has used or that he maintains;

D.      For further permanent injunctive relief as deemed necessary by the Court;

E.      For an award of CoStar's costs, including its reasonable attorneys' fees and disbursements of counsel, as permitted by law;

F.      For prejudgment and post-judgment interest according to law;

G.      For exemplary damages to the extent available; and

H.      For such further and additional relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

CoStar demands a trial by jury on all issues properly tried to a jury.

Dated:  October 3, 2018

Respectfully submitted,


By:  ___/s/ Jena R. Neuscheler_____

Nicholas J. Boyle (D.C. Bar No. 481098)
David R.J. Riskin (D.C. Bar No. 992710)
Jena R. Neuscheler (D.C. Bar No. 187814)
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, DC 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
nboyle@wc.com
driskin@wc.com
jneuscheler@wc.com

*Attorneys for CoStar Group, Inc. and CoStar Realty Information, Inc.*